Thomas E. Wheeler, CA Bar #304191
Environmental Protection Information Center
145 G Street, Suite A
Arcata, California 95521
Tel: (707) 822-7711; email: tom@wildcalifornia.org

Peter M. K. Frost, applicant, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Tel: (541) 359-3239; email: frost@westernlaw.org.

Sangye Ince-Johannsen, applicant, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Tel: (541) 778-6626; email: sangyeij@westernlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER; FRIENDS OF THE SHASTA RIVER,<br><br>    Plaintiffs,<br><br>    vs.<br><br>ALECIA VAN ATTA, in her official capacity, Assistant Regional Administrator, California Coastal Office, National Marine Fisheries Service; JIM SIMONDET, in his official capacity, Contact, California Coastal Office, National Marine Fisheries Service; NATIONAL MARINE FISHERIES SERVICE, California Coastal Office,<br><br>    Defendants. | **COMPLAINT** |

Complaint

Introduction.

1.  Plaintiffs Environmental Protection Information Center et al. ("EPIC") hereby respectfully file this suit challenging the actions of Defendants Alecia Van Atta et al. ("NMFS") to issue 14 permits authorizing "take" of Southern Oregon Northern Coast California ("SONCC") coho salmon listed under the Endangered Species Act ("ESA") as threatened with extinction in the Shasta River in California. The permits authorize continued water impoundments, diversions, and other "routine agricultural activities" that result in altered or diminished flows in the Shasta River and harm to coho salmon. The permits are unlawful under Section 10 of the ESA. To seek to comply with Section 7 of the ESA, NMFS prepared a Biological Opinion to evaluate effects on coho salmon of its decision to issue the permits, and prepared an Environmental Assessment under the National Environmental Policy Act ("NEPA") to evaluate the same or similar effects. The Biological Opinion is unlawful under the ESA and the Environmental Assessment is unlawful under NEPA. Accordingly, EPIC seeks declaratory and injunctive relief to remedy harm to it and coho salmon.

Jurisdiction.

2.  Pursuant to LR 3-5(a), this Court has jurisdiction to resolve the claims in this case under 28 U.S.C. § 1131 (federal question) and 16 U.S.C. § 1540(g)(1) (ESA citizen suit provision). Pursuant to the ESA citizen suit provision, more than 60 days ago, EPIC gave NMFS written notice of its intent to sue for claims that may be brought pursuant to the provision. 16 U.S.C. § 1540(g)(2). The parties engaged in discussions, but NMFS has not remedied its violations of the ESA, which continue.

3.  Final agency action exists that is subject to judicial review under the APA. 5 U.S.C. §§ 704, 702. The injunctive relief EPIC seeks is proper under 16 U.S.C. § 1540(g)(1)(A), 28 U.S.C. § 1651(a), 28 U.S.C. §§ 2201–02, and 5 U.S.C. §§ 701–06.

Venue.

4.  Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391.

Divisional Assignment.

Complaint                                                                                          1

5. Pursuant to LR 3-2(c)–(d), Defendant Alecia Van Atta is the Assistant Regional Administrator of the California Coastal Office of NMFS, and is located in Santa Rosa, California, which is in Sonoma County and the San Francisco Division. Defendant NMFS, California Coastal Office, is located in Santa Rosa, California, which is in Sonoma County and the San Francisco Division. Defendant Jim Simondet is the Branch Chief of the California Coastal Office of NMFS, and is located in Arcata, California, which is in Humboldt County and the Eureka Division. Plaintiff EPIC is located in Arcata, California, which is in Humboldt County and the Eureka Division.

Parties.

6. Plaintiff EPIC is a registered non-profit conservation group located in Arcata, California. Since 1977, EPIC has defended the wildlife and wild places of the Klamath Mountains and North Coast Range. EPIC's mission is to use science to protect and restore the resources of northern California. EPIC's advocacy utilizes community organizing, public education, collaboration, and litigation and substantive commenting on proposals and projects that would negatively impact public and private forestlands, rivers, and fish and wildlife. EPIC has approximately 15,000 members and supporters, who live in northern California and adjacent areas. EPIC and its members have been and will continue to be harmed by NMFS's decisions related to the Shasta River and the native coho salmon that find habitat in the watershed.

7. Plaintiff Friends of the Shasta River ("Friends") is a registered non-profit conservation group headquartered in Yreka, California. Friends was formed in 2020 by a group of concerned local citizens who live, work, and recreate in the Shasta River basin. Some members are riparian property owners along the Shasta River. Some members' families have ranched or lived in the Shasta River basin for generations. Some members have worked in professional capacities for

volunteer or public agencies to preserve and restore the Shasta River and, in particular, its native fish runs. Friends and its members have been and remain deeply concerned about deteriorating conditions and decreasing fish runs in the Shasta River. The professional, personal, aesthetic, spiritual, and other interests of Friends and its members have been and continue to be harmed by public agency decisionmaking related to the Shasta River, including but not limited to NMFS's decision to issue fourteen "take" permits. Friends commented on the draft EA, and otherwise has participated fully as allowed in the public processes NMFS allowed to influence its decisionmaking related to the Shasta River and coho and Chinook runs.

8.  Defendant Alecia Van Atta is the Assistant Regional Administrator, California Coastal Office of NMFS in Santa Rosa, California. She is sued in her official capacity. On November 17, 2020, Van Atta signed a Biological Opinion evaluating issuing 14 Section 10(a)(1)(A) Enhancement of Survival Permits and entering into the "Template Safe Harbor Agreement for Conservation of Coho Salmon in the Shasta River." Van Atta is responsible for complying with the ESA and other federal laws.

9.  Defendant Jim Simondet is the Branch Chief of the California Coastal Office of NMFS, Klamath Branch, in Arcata, California. He is sued in his official capacity. In 2020, NMFS issued an Environmental Assessment that designates Simondet as the agency's "contact." Simondet is responsible for complying with NEPA and other federal laws.

10. Defendant NMFS, California Coastal Office, is in Santa Rosa, California, and is a federal agency within the U.S. Department of Commerce. NMFS, its management, and its staff are responsible for complying with the ESA, NEPA, and other federal laws.

Facts.

11. The Shasta River in California originates from two different sources.

12. Snowmelt during the spring and early summer from Mount Eddy in the Klamath Mountains in California flows easterly and then northerly where it meets flows from cold springs originating from late summer glacial melt on the 14,179-foot cascade volcano, Mount Shasta.

13. The Shasta River flows for 58 miles to its confluence with the Klamath River.

14. The Shasta River watershed covers 793 square miles.

15. Historically, the Shasta River basin experiences cold winters and hot, dry summers.

16. Rainfall in the broad, flat valley portion of the Shasta River is about 14 inches annually.

17. In recent years, the Shasta River basin has experienced drought.

18. Coho salmon in the Shasta River evolved with areas of large spring complexes, which provided sustained sources of cold, clean, high-quality water, and abundant areas for rearing during hot, dry summer months.

19. Coho salmon in the Shasta River have a three-year life cycle.

20. Adults coho salmon return to freshwater in mid-October, and spawn in the Shasta River.

21. Coho salmon eggs incubate in redds (nests) in the Shasta River for 1.5 to four months.

22. Coho salmon juveniles emerge generally in March through early May.

23. After emergence, juvenile coho salmon then "rear" in freshwater for up to 15 months.

24. After outmigration, coho salmon spend approximately 15 months in the ocean, before returning as adults.

25. Coho salmon in the Shasta River spawn in the Shasta River canyon from river mile 0 to 7.

26. Coho salmon in the Shasta River spawn in the mainstem river from river mile 32 to 36.

27. Coho salmon in the Shasta River basin spawn in Big Springs Creek.

28. Coho salmon in the Shasta River basin spawn in lower Parks Creek.

29. Juvenile coho salmon in the Shasta River basin rear in the Shasta River canyon from river mile 0 to 7.

30. Juvenile coho salmon in the Shasta River basin rear in the mainstem river from river mile 32 to 36.

31. Juvenile coho salmon in the Shasta River basin rear in Big Springs Creek.

32. Juvenile coho salmon in the Shasta River basin rear in lower Parks Creek.

33. Juvenile coho salmon in the Shasta River basin rear in lower Yreka Creek.

34. Juvenile coho salmon in the Shasta River basin rear in the upper Shasta River downstream of Dwinnell Dam.

35. Historically, in the "upper range" of 6,000 to 15,000 coho spawned in the Shasta River basin.

36. Beginning in 1934, population estimates were based on adult counts at a weir near the river mouth and spawning surveys.

37. By the late 1950s, approximately 1,000 adult coho returned to the Shasta.

38. By the 1960s, approximately 600 adult coho returned to the Shasta River

39. By 1996, approximately 200 adult coho returned to the Shasta River.

40. In 1997, NMFS listed coho salmon within the Southern Oregon/Northern California Coast evolutionarily significant unit ("ESU"), which extends from the Elk River in Oregon south to the Mattole River in California (including the Shasta River), as threatened with extinction.

41. 115 adult coho returned to the Shasta River in 2012.

42. 39 adult coho returned to the Shasta River in 2018.

43. 37 adult coho returned to the Shasta River in 2020.

44. The California Department of Fish and Wildlife ("CDFW") operates a rotary screw trap at approximately river mile 0.2 in the Shasta River.

45. The rotary screw trap in the Shasta River estimates, in part, abundance of outmigrating coho salmon.

46. CDFW operates a video counting weir in the Shasta River, located approximately 213 meters from the confluence of the Shasta and Klamath Rivers.

47. The video counting weir in the Shasta River estimates, in part, the number of returning adult coho.

48. In 1928, Dwinnell Dam was built at river mile 40.6.

49. The Montague Water Conservation District ("Montague") operates Dwinnell Dam.

50. Dwinnell Dam blocks upstream migration for coho salmon.

51. Dwinnell Dam blocks 61.4 miles (22%) of coho salmon habitat in the Shasta River basin.

52. Dwinnell Dam creates an impoundment called "Lake Shastina."

53. The Lake Shastina impoundment stores up to 35,000 acre-feet of water from the Upper Shasta River.

54. The Lake Shastina impoundment stores up to 14,000 acre-feet diverted from Parks Creek.

55. Montague delivers water from the Lake Shastina impoundment into a main canal.

56. The main canal is approximately 20 miles long.

57. Montague has delivered annually approximately 10,000 acre-feet of water into its main canal.

58. Montague releases up to 1,984 acre-feet of water into the river below Dwinnell Dam to supply "prior rights."

59. Montague can operate the "Flying L" groundwater pumps.

60. The Flying L groundwater pumps are located 1.3 kilometers downstream of Dwinnell Dam.

Complaint                                                                                                                          6

61. The Flying L groundwater pumps can supply more water into the main canal to be used for irrigation.

62. The Flying L groundwater pumps can supply more water into the river to increase flows.

63. In 2017, NMFS issued a BiOp to evaluate a proposed Conservation and Habitat Enhancement Restoration Project ("CHERP") related to the operations of Dwinnell Dam.

64. In 1999, NMFS and the U.S. Fish and Wildlife Service adopted a "Safe Harbor" policy.

65. In 2020, NMFS issued an Environmental Assessment under NEPA to evaluate effects of entering into safe harbor agreements with 14 applicants and issuing Enhancement of Survival Permits under Section 10(a)(1)(A) of the ESA.

66. In 2020, NMFS issued a Biological Opinion to evaluate the effects on coho of issuing the permits.

67. On August 10, 2021, NMFS issued the permits.

68. The permits have 20-year terms.

69. NMFS and the permittees can by their consent extend the terms of the permits.

70. Montague is a permittee.

71. The permits exempt from the prohibition on take under Section 9 of the ESA certain activities on the permittees' "Enrolled Properties."

72. The "Enrolled Properties" and the "Covered Area" are geographically the same.

73. The permits cover "Covered Activities."

74. Covered Activities includes "routine agricultural activities."

75. "Routine agricultural activities" includes diversions of water from the Shasta River.

76. "Routine agriculture activities" includes irrigation run-off into the Shasta River.

77. "Routine agricultural activities" includes irrigation return flows to the Shasta River.

78. "Routine agricultural activities" includes the impoundment created by Dwinnell Dam.

79. "Routine agricultural activities" includes the operations of Dwinnell Dam.

80. The operation of Dwinnell Dam includes delivery of water into the main canal.

81. The operation of Dwinnell Dam includes irrigation run-off from properties Montague serves.

82. The operation of Dwinnell Dam includes irrigation return flows from properties Montague serves.

83. The irrigation season in the Shasta River basin begins in tributaries on March 1.

84. The irrigation season in the Shasta River basin begins in the mainstem and Parks Creek on April 1.

85. Before construction of Dwinnell Dam and diversions from the Shasta River, historic flows in the river are estimated to be approximately 400 cubic feet per second early May.

86. Before construction of Dwinnell Dam and diversions from the Shasta River, the river maintained a flow of approximately 103 cubic feet per second during the summer months.

87. The 2020 Biological Opinion evaluates a Flow Management Strategy.

88. The Flow Management Strategy seeks to obtain "Tier 1" flows in the Shasta River in the summer.

89. Tier 1 flows are suboptimal for rearing coho.

90. Base flows in the Shasta River basin return within weeks after irrigation ceases.

91. Some permittees' water diversion structures are at or below the high-water mark of the Shasta River.

92. Some permittees' water diversion installations are at or below the high-water mark of the Shasta River.

93. Some permittees use push up dams or other physical alterations of the bed of the Shasta River to divert or control water.

94. The permittees' diversions from the Shasta River contribute to or cause diminished flows.

95. The permittees' diversions from the Shasta River contribute to or cause elevated stream temperatures.

96. Irrigation return flows from some Enrolled Properties contribute to or cause warming of the Shasta River.

97. Irrigation return flows from Enrolled Properties can return to the river water 10°C warmer than the river.

98. Montague supplies water to properties downstream of the Enrolled Properties.

99. Irrigation return flows from water supplied by Montague enter the Shasta River downstream of the Enrolled Properties.

100. There are 11 monitoring stations installed in the Shasta River basin.

101. Eight of the 11 installed monitoring stations provide "public" data access.

102. Public data access means data are provided at or nearly "real time."

103. Three of the 11 installed monitoring stations provide "private" data access.

104. Private data access means data are not provided or nearly "real time."

105. The permittees that control private data access at monitoring stations may report data on a monthly basis.

106. The banks of the Shasta River up to the ordinary high-water mark adjacent to the Enrolled Properties are publicly-owned.

107. The bed of the Shasta River adjacent to the Enrolled Properties is publicly-owned.

108. The Lowell L. Novy Revocable Trust ("Novy") is a permittee.

109. Novy diverts water under a state law claim of riparian rights.

Complaint 9

110. Novy applies water it diverts under a state claim claim of riparian rights to non-riparian lands.

Claims for Relief: ESA.

111. EPIC realleges all allegations.

112. Under Section 7 of the ESA, NMFS must insure any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of the species' critical habitat. 16 U.S.C. § 1536(a)(2). NMFS issued a Biological Opinion finding that its decision to issue the permits and enter into safe harbor agreements will not jeopardize the continued existence of SONCC coho salmon or adversely modify or destroy its critical habitat. 16 U.S.C. §§ 1536(a)(2), (b). NMFS issued an unlawful Biological Opinion that erroneously finds these actions will not cause jeopardy to SONCC coho salmon or destroy or adversely modify its critical habitat.

113. The Biological Opinion defines the "environmental baseline" for SONCC coho salmon in the Covered Area. 50 C.F.R. § 402.02. The environmental baseline includes the permittees' existing and ongoing water diversions and deliveries, even though the permits confer immunity from liability for these diversions and deliveries as routine agricultural activities. Under Section 7 of the ESA, the effects of the proposed action are added to the environmental baseline to determine jeopardy. 50 C.F.R. § 402.14(g)(4). The proposed action in the Biological Opinion includes ostensibly beneficial management actions. The Biological Opinion excludes routine agricultural activities from the requisite jeopardy analysis.

114. A Biological Opinion must determine the "action area," including "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The Biological Opinion defines the action area in the Shasta

River basin to end at the farthest downstream portion of the Enrolled Properties. The direct and indirect effects on coho in the Shasta River of issuing the permits extend outside of the action area. The action area defined in the Biological Opinion unlawfully excludes areas where direct and indirect effects to SONCC coho will occur.

115. The Biological Opinion does not use and is not based on the best available science related to, among other things, river flows.

116. As mitigation to avoid jeopardy, the Biological Opinion unlawfully relies on project completion and other measures that are unfunded, or unlikely or uncertain to occur. In determining no jeopardy, the Biological Opinion unlawfully relies on "performance indicators" that do not mandate corrective action if exceeded and do not insure against jeopardy.

117. NMFS's issuance of permits to authorize routine agricultural activities and other activities in the Shasta River basin will unlawfully jeopardize the continued existence of SONCC coho and destroy or adversely modify its critical habitat.

118. NMFS's reliance on the legally and factually flawed Biological Opinion violates its duty to insure its actions will not jeopardize the continued existence of SONCC coho salmon.

119. If NMFS determines a proposed action is not likely to jeopardize a species, it must also evaluate whether the action may take individual members of the species. 16 U.S.C. § 1536(b)(4). If so, NMFS must issue an incidental take statement that (1) prescribes the amount or extent of incidental take; (2) reasonable and prudent measures to minimize the impact; and (3) mandatory terms and conditions necessary to meet the measures. 50 C.F.R. §§ 402.14(i)(1)(i), (ii), (iv). NMFS prepared an incidental take statement. The incidental take statement is unlawful for several reasons, including but not limited to (a) failing to set an amount or extent of incidental take expressed in numbers of coho, (b) failing to use a lawful take surrogate, (c) using as a take

surrogate an ambiguous and untimely standard related to completing projects improperly deemed beneficial to coho.

120. Under 50 C.F.R. § 222.308(a), NMFS may not issue an Enhancement of Survival Permit unless and until it has obtained proof of compliance with applicable state laws. NMFS issued permits authorizing incidental take for numerous activities that impact coho without first obtaining proof of compliance with applicable state laws. Independently, NMFS issued permits that cover activities that do not comply with applicable state laws, including but not limited to the permit issued to Novy, which is diverting water under a claim of riparian rights and unlawfully applying the water to non-riparian lands.

121. Under Section 10(a)(1) of the ESA, NMFS may issue permits and exempt from liability under Section 9 take that is "for scientific purposes or to enhance the propagation or survival of the affected species," and, separately, take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(A) & (B). Permits authorizing take for scientific purposes or to enhance the propagation or survival of the affected species cover direct or intentional take and incidental take of the species. Permits authorizing take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity cover incidental or indirect take. NMFS violated the ESA by issuing permits to enhance the propagation or survival of coho to entities that were and are causing incidental take of coho that is not the purpose of the carrying out of what may be otherwise lawful activities.

122. Under Section 10(d) of the ESA, NMFS may not issue permits under Section 10(a)(1)(A) of the ESA unless and until it has found and published in the Federal Register its finding that the permits "will not operate to the disadvantage" of listed species, and "will be consistent with the purposes and policy" of the ESA. 16 U.S.C. § 1539(d). NMFS issued the permits under Section

10(a)(1)(A) of the ESA without first finding and publishing in the Federal Register its finding that the permits will not operate to the disadvantage of SONCC coho salmon and will be consistent with the purposes and policy of the ESA. The permits will operate to the disadvantage of SONCC coho salmon, because the adverse effects of the routine agricultural activities they authorize outweigh any purported positive effects of the beneficial management activities set forth in the safe harbor agreements.

123. Under the Safe Harbor Policy, NMFS cannot issue Enhancement of Survival Permits or enter safe harbor agreements unless they will achieve a "net conservation benefit" for the species. 64 Fed. Reg. 32,722. The permits and safe harbor agreements will not achieve a "net conservation benefit" for SONCC coho salmon, at least because any purported positive effects of the beneficial management activities set forth in the safe harbor agreements are outweighed by the adverse effects of the routine agricultural activities authorized by the permits. Further, NMFS failed to define baseline conditions for the enrolled properties that reflect the known biological habitat characteristics that support existing levels of use of the properties by SONCC coho salmon. SONCC coho salmon are so depleted at both the ESU and Shasta River core population level that considerable improvement over baseline conditions is necessary to achieve a net conservation benefit, and the safe harbor agreements do not guarantee a considerable improvement over baseline conditions.

Claims for Relief: NEPA.

124. EPIC realleges all allegations.

125. NMFS prepared its Environmental Assessment under the 1978 NEPA regulations. The Environmental Assessment fails to include "high quality" information and "[a]ccurate scientific analysis" as required by NEPA. 40 C.F.R. § 1500.1(b). The Environmental Assessment fails to take a "hard look" at the consequences and effects on coho of the routine agricultural activities

Complaint 13

and other activities. NMFS violated NEPA by failing to analyze the alternative of issuing Incidental Take Permits governed by a Habitat Conservation Plan under Section 10(a)(1)(B) of the ESA, which is a reasonable alternative to issuing Enhancement of Survival Permits governed by Safe Harbor agreements under Section 10(a)(1)(A) of the ESA. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14(a).

126. NMFS violated NEPA by preparing a Finding of No Significant Impact. NMFS's issuance of the permits has had and will continue to have a significant effect on the environment because, in part of the unique characteristics of the geographic area, and the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, 40 C.F.R. § 1508.27(b)(3) & (5). NMFS was required to but failed to prepare an EIS.

Claims for Relief: Administrative Procedure Act.

127. EPIC realleges all allegations.

128. NMFS's decisions and other actions concerning the Enhancement of Survival Permits, Safe Harbor agreements, and Biological Opinion constitute "agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704 & 706(2)(A).

Relief Requested.

EPIC respectfully requests that the Court grant the following relief:

1. Issue a declaratory judgment that NMFS has violated the ESA as alleged;

2. Issue a declaratory judgment that NMFS has violated NEPA as alleged;

3. Issue a declaratory judgment that NMFS has violated the APA as alleged;

4. Set aside, vacate, and remand the Biological Opinion to NMFS and order NMFS to prepare a legally sufficient opinion;

5. Set aside, vacate, and remand the Environmental Assessment, Finding of No Significant Impact, and Decision to NMFS, and order NMFS to prepare an Environmental Impact Statement;

6.     Grant such other injunctive relief as EPIC may seek or the Court deems just and proper.

Date: June 15, 2022.     Respectfully submitted,

/s/ Thomas E. Wheeler
Thomas E. Wheeler, CA Bar #304191
Peter M. K. Frost, applicant, *pro hac vice*
Sangye Ince-Johannsen, applicant, *pro hac vice*
Attorneys for Plaintiffs