

HEADQUARTERS
120 Shelton McMurphey Blvd.
Suite 340
Eugene, OR 97401
(541) 485-2471
info@westernlaw.org

OFFICES
Oregon
Washington
New Mexico
Montana
Colorado

Defending the West      westernlaw.org

# WESTERN ENVIRONMENTAL LAW CENTER

Via First Class Mail Registered Receipt

February 24, 2022

| | |
|---|---|
| Alecia Van Atta<br>Assistant Regional Administrator<br>California Coastal Office<br>National Marine Fisheries Service<br>777 Sonoma Avenue, Room 325<br>Santa Rosa, California 95404 | Janet Coit<br>Director<br>National Marine Fisheries Service<br>1315 East-West Highway<br>Silver Spring, Maryland 20910 |
| Jim Simondet<br>West Coast Region<br>California Coastal Office, Klamath Branch<br>National Marine Fisheries Service<br>1655 Heindon Road<br>Arcata, California 95521 | Gina Raimond<br>Secretary of Commerce<br>U.S. Department of Commerce<br>1401 Constitution Avenue, N.W.<br>Washington, D.C. 20230 |

Re:   Shasta Safe Harbor Agreement and Enhancement of Survival Permits

Dear Sirs and Madames,

We write on behalf of the Friends of the Shasta River and Environmental Protection Information Center to notify the National Marine Fisheries Service ("NMFS"), pursuant to the citizen suit provision of the Endangered Species Act ("ESA"), that notifiers intend to sue NMFS for violating and continuing to violate the ESA in regard to coho salmon in the Shasta River in California. NMFS has violated the ESA by authorizing, approving, causing, or otherwise carrying out agency actions that jeopardize the continued existence of coho salmon in the Shasta River, a species listed under the ESA as threatened with extinction. Among other things, NMFS has issued Enhancement of Survival Permits that authorize, approve, or acquiesce to the actions of fourteen permittees whose activities in, along, and affecting the Shasta River have unlawfully taken coho salmon and continue to do so, and individually and collectively cause or contribute to jeopardizing the species' continued existence and adversely modifying its critical habitat. Unless NMFS promptly remedies its past and continuing violations of the ESA, notifiers will file suit in federal court to seek appropriate relief.

The ESA.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Under Section 7 of the ESA, federal agencies must consult with NMFS to "insure that any action authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" of anadromous fish, "or result in the destruction or adverse modification of" such species' critical habitat. 16 U.S.C. § 1536(a)(2). Where a federal action is likely to adversely affect a listed species or its critical habitat, the "consulting agency" must prepare a Biological Opinion ("BiOp") that addresses the status of the species and analyzes whether the proposed action, along with direct, indirect, and cumulative effects, will jeopardize it. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 518 (9th Cir. 2010) (citing 50 C.F.R. § 402.14(g)).[1]

"To 'jeopardize the continued existence' of a species is to 'engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of the species.'" *Id.* (quoting 50 C.F.R. § 402.02). "[T]he jeopardy regulation requires [NMFS] to consider both recovery and survival impacts." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Service*, 524 F.3d 917, 931 (9th Cir. 2008). "The goal of the ESA is not just to ensure survival, but to ensure that the species recovers to the point that it can be delisted. Survival and recovery are intertwined and are the complementary goals of the consultation process." *Alaska v. Lubchenco*, 723 F.3d 1043, 1054 (9th Cir. 2013) (internal citation omitted). When an agency relies arbitrarily and capriciously on a flawed BiOp, it violates its substantive duty under the ESA to ensure that its actions are not likely to jeopardize a listed species or adversely modify its critical habitat. *Wild Fish Conservancy*, 628 F.3d at 532.

In turn, Section 9 of the ESA prohibits "take" of individual members of a listed species. *Wild Fish Conservancy*, 628 F.3d at 519 (citing 16 U.S.C. § 1538). If, during consultation under Section 7, NMFS "concludes that an action will not jeopardize the existence of a listed species or adversely modify its habitat, but the project is likely to result in incidental taking of listed species, [it] must provide a written statement with the BiOp that authorizes such takfings." *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007). A purpose of an incidental take statement is to set a permissible amount or extent of take of members of the species, to "set forth a 'trigger' that, when reached" requires the parties to reinitiate consultation to ensure excessive take does not jeopardize the species. *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Service*, 273 F.3d 1229, 1249 (9th Cir. 2001).

---

[1] An agency engaged in intra-agency consultation (i.e. where it is both the action and consulting agency), as NMFS is here, has the same duty to avoid jeopardy. *Envt'l Prot. Info. Ctr. v. Pacific Lumber Co.*, 67 F. Supp. 2d 1113, 1120–21 (N.D. Cal. 1999), *vacated in part on other grounds*, 257 F.3d 1071 (9th Cir. 2001).

Background.

The Shasta River originates on Mount Eddy in the Klamath Mountains in California, and flows easterly and then northerly for 58 miles to its confluence with the Klamath River. The Shasta River watershed covers 793 square miles. The basin generally experiences cold winters and hot dry summers. Historically, the basin receives only about 14 inches of rain annually, but also receives substantial flows from cold springs originating in glaciers and snow on 14,179-foot Mount Shasta. The basin has experienced significant drought in recent years.

Coho salmon in the Shasta River generally have a three-year life cycle. Adults return to freshwater in mid-October through December to spawn. Eggs incubate in redds (nests) for 1.5 to 4 months, and juveniles emerge generally in March through early May. Juvenile coho then "rear" for up to 15 months in freshwater, meaning they must survive one summer. After juveniles undergo smoltification and emigrate, they spend another 15 months in the ocean before returning as adults.

Coho salmon in the Shasta River evolved with areas of large spring complexes, which provided sustained sources of cold, clean, high quality water, and abundant areas for juveniles to rear. Cold springs in the Shasta River basin create cold water refugia for juvenile coho, decrease overall water temperatures throughout the basin, and allow for successful summer rearing of individuals in natal and non-natal creeks, and the mainstem.

Since about 1934, estimates of adult coho salmon returns in the Shasta River have been based on spawning surveys and counts at a weir downstream of river mile 1. Historically, thousands of adult coho salmon returned to the Shasta River basin. Recently, a small fraction of that amount returned.

In 1997, NMFS listed coho salmon within the Southern Oregon/Northern California Coast ("SONCC") evolutionarily significant unit ("ESU"), which extends from the Elk River in Oregon south to the Mattole River in California (including the Shasta River), as threatened with extinction under the ESA. 62 Fed. Reg. 24,588 (May 6, 1997). There are 30 independent coho salmon populations within the SONCC ESU. Coho in the Shasta comprise a "core" population. In 1999, NMFS designated critical habitat for the species. 64 Fed. Reg. 24,049 (May 5, 1999).

When it listed SONCC coho, NMFS identified factors contributing to the listing, including dams and water withdrawals, and elevated water temperatures and altered streamflows. NMFS has identified agricultural practices and dams/diversions as "key limiting threats" to recovery of coho in the Shasta River. Dwinnell Dam, ranches, and irrigation diversions reduce river flows, impound or divert river water, and contribute heated tailwaters to the Shasta River generally from April 1 to October 1. Among other effects on coho salmon, these activities alter hydrologic function, cause impaired water quality, degrade spawning and rearing habitat, reduce stream flows, and cause high stream temperatures. The State of California has determined the Shasta River is impaired under the Clean Water Act for the parameters of temperature and dissolved oxygen.

Enhancement of Survival Permits.

The ESA authorizes NMFS to issue permits allowing intentional "take" of listed species "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1538(a)(1).

The Safe Harbor Policy.

In 1999, NMFS and the U.S. Fish and Wildlife Service adopted a "Safe Harbor" policy. *Announcement of Final Safe Harbor Policy,* 64 Fed. Reg. 32,717 (June 17, 1999). The agencies noted some listed species "occur exclusively, or to a large extent, on non-Federally owned property," and wanted to "provide[] incentives for private and other non-Federal property owners to restore, enhance, or maintain habitats for listed species." *Id*. The policy provides that if a landowner enters into a Safe Harbor agreement and adopts "voluntarily conservation measures" that benefit a listed species, the landowner will not be liable for take if "the covered species later become more numerous as a result of the property owner[']s actions." *Id*. Under the policy, a "baseline" is set at the number of listed species or its range on the private land when the landowner enters into the agreement; if the landowner's voluntary actions increase the species' number or range, "the landowner would be authorized to [later] incidentally 'take' those individuals above the baseline without penalty." *Id*. In other words, the status quo of the species' number or range is preserved, but any increases are not. Nonetheless, as long as the agreement results in a "net conservation benefit" for the species, the policy may apply. *Id*. at 32,722.

Shasta Safe Harbor Agreements.

In 2019, eleven ranches, two irrigation districts, and the California Department of Fish and Wildlife ("CDFW") applied to NMFS to enroll in a Shasta River Template Safe Harbor Agreement and sought fourteen Enhancement of Survival Permits. 84 Fed. Reg. 55,145 (Oct. 15, 2019). On March 1, 2021, NMFS issued an Environmental Assessment under the National Environmental Policy Act ("NEPA") that purports to evaluate the environmental effects of whether to approve the agreements and issue the permits. NMFS decided to do so, and found its decision would not have a significant impact on the environment. On August 10, 2021, NMFS issued the permits. *Issuance of 14 Enhancement of Survival Permits*, 86 Fed. Reg. 43,629 (Aug. 10, 2021).

NMFS issued two BiOps that underpin or relate to its decision to issue the permits. The first, issued in September 2017, purports to evaluate the effects on coho of Montague Water Conservation District's Conservation and Habitat Enhancement Restoration Project in Siskiyou County (No. WCR-2015-2609). The second, issued in November 2020, tiers to or incorporates decisions made in the first BiOp, and purports to evaluate the effects on coho of issuance of the permits (ARN# 151422WCR2020AR00218).

Violations of the ESA.

NMFS violated the ESA by issuing the permits—actions likely to adversely affect coho and its critical habitat—based on unlawful BiOps. The BiOps contain legal and factual flaws, and NMFS's decision to issue the permits notwithstanding these flaws violates its duty to ensure its actions are not likely to jeopardize the continued existence of coho or destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2).

In the 2020 BiOp, NMFS defined the action area to exclude areas directly and indirectly affected by the action, unlawfully limiting the action area to the "covered areas" under the Safe Harbor Agreement—*i.e.*, "the immediate area involved in the action." 50 C.F.R. § 402.02. The action area improperly excludes at least the Shasta River downstream of river mile 20, as well as other areas within the ESU that are affected by the agency's actions. As a result, the action area improperly excludes juvenile rearing habitat adversely affected by the permitees' diversions and releases, tailwaters of participating landowners, and tailwaters generated from those served by the Montague Water Conservation District and likely the Grenada Irrigation District. NMFS's conclusion that effects downstream of the enrolled properties will be insignificant is unsupported by the record and inconsistent with the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2).

In both BiOps, NMFS unlawfully subsumed permittees' existing and ongoing diversions and releases into the environmental baseline rather than analyzing their effects as causing or contributing to jeopardy. The permittees' existing and ongoing diversions constitute part of the action because the permits grant immunity from liability for take caused by these diversions. 50 C.F.R. § 402.02. The effects of the existing and ongoing diversions must therefore be analyzed as to whether they cause jeopardy. 50 C.F.R. §§ 402.14(g)(3)–(4), (h)(1)(iii). NMFS's decision to conceal the effects of existing and ongoing diversions and releases in the environmental baseline rather than analyzing their effects violates its duty to ensure its actions will not jeopardize the continued existence of the SONCC ESU. *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 929–30 (9th Cir. 2008).

To reach its no-jeopardy conclusions, NMFS relied on conservation measures that are uncertain to occur and/or do not sufficiently insure against jeopardy to the ESU or adverse modification of its critical habitat. In the 2020 BiOp, NMFS states it "expects" 80% of the permitees' voluntary conservation measures to be completed within 5 years. This timeframe improperly ignores the 3-year life-cycle of coho. NMFS failed to consider or explain how up to one-and-two-thirds generations of coho can survive in the Shasta River before any benefits from the voluntary conservation measures materialize. It is uncertain that any benefits from these measures will materialize in time to avoid jeopardy to the species. NMFS has violated its duty to ensure its decision to grant the permits will not jeopardize the ESU before the 5-year check-in date. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1037 (9th Cir. 2001); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005).

5

NMFS's decision to adopt 18° Celsius as a "performance indicator" in the 2020 BiOp is inconsistent with the best scientific and commercial data available, and will cause jeopardy to the continued existence of the species. 16 U.S.C. § 1536(a)(2). The best data available indicate 18° Celsius is at the high end of the "sub-optimal" range of temperatures for rearing juvenile coho, and that even the upper optimal temperature limit is 16° Celsius. Further, the Shasta warms as it flows down from upriver monitoring stations, so exceedances of the performance standard at upstream stations will allow worse if not lethal temperatures downstream. Further, the performance indicator is unenforceable as there are no legal consequences if it is exceeded. NMFS's decision to rely on an unsupported and unenforceable performance indicator in the BiOp violates its duty to insure its actions will not jeopardize the continued existence of the SONCC ESU or result in the destruction or adverse modification of critical habitat. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020).

NMFS's decision to adopt Tier 1 flow objectives from McBain & Trush Inc. as a benchmark for improving water temperatures is inconsistent with the best scientific and commercial data available, and risks jeopardy to the continued existence of the species. 16 U.S.C. § 1536(a)(2). The best scientific and commercial data available demonstrates that Tier 1 flows are adequate at most for the survival of only some individuals, and not adequate to protect the survival or recovery of the population as a whole.

A Safe Harbor Agreement is an improper and unlawful mechanism to address ongoing and future take by these permittees. It gives them the option of returning to baseline or slightly elevated baseline conditions—both of which still jeopardize the continued existence of coho and adversely modify or destroy its critical habitat. *Cf.* 64 Fed. Reg. 32,717.

Conclusion.

In sum, NMFS's decisions to issue the BiOps, rely on the Safe Harbor Policy, and grant the Enhancement of Survival permits are unlawful and likely to jeopardize the continued existence of coho or destroy or adversely modify its critical habitat. If these violations are not corrected within 60 days, we intend to pursue legal action on behalf of our clients. If you have questions, or would like to discuss this matter, please contact us.

Sincerely,

Sangye Ince-Johannsen
Peter M. K. Frost
Western Environmental Law Center
120 Shelton McMurphey Blvd, Suite 340
Eugene, Oregon 97401