Thomas E. Wheeler, CA Bar #304191
Environmental Protection Information Center
145 G Street, Suite A
Arcata, California 95521
Tel: (707) 822-7711; email: tom@wildcalifornia.org

Peter M. K. Frost, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Tel: (541) 359-3238; email: frost@westernlaw.org

Sangye Ince-Johannsen, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Tel: (541) 778-6626; email: sangyeij@westernlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER, et al., | ) Case No. 3:22-cv-03520-TLT |
| | ) |
| Plaintiffs, | ) **PLAINTIFFS' REPLY TO** |
| | ) **DEFENDANTS' RESPONSE** |
| | ) **TO PLAINTIFFS' MOTION** |
| vs. | ) **FOR ATTORNEYS' FEES,** |
| | ) **AND OTHER EXPENSES** |
| ALECIA VAN ATTA, et al., | ) |
| | ) Hearing: December 9, 2025, 2 p.m. |
| Defendants. | ) Courtroom 9, 19th Floor |
| | ). Hon. Trina L. Thompson |

## Table of Contents

Table of Contents ................................................................................................ i

Table of Authorities ............................................................................................. ii

A.  Plaintiffs' Motion is Properly Brought under EAJA. ...................................... 1

B.  Plaintiffs' Motion is Timely. ........................................................................ 1

C.  NMFS's Position Was Not Substantially Justified. ......................................... 2

    1.  NMFS's Underlying Action Was Not Substantially Justified. ...................... 2

    2.  NMFS's Litigation Position Was Not Substantially Justified. ...................... 3

D.  Plaintiffs Seek Reasonable Rates. ................................................................. 6

    1.  Mr. Ince-Johannsen Possesses Distinctive Skills in Environmental Litigation. ............... 6

    2.  Plaintiffs' Attorneys' Distinctive Skills Were Needed in this Case. ................ 6

    3.  Plaintiffs Prove Qualified Counsel Were Unavailable at the EAJA Base Rate. ............... 7

    4.  There Is No Precedent For Departing from the Forum Rule. ........................ 9

    5.  Mr. Wheeler is Entitled to Fees. ............................................................ 10

E.  Plaintiffs Seek Reasonable Time. ................................................................ 10

    1.  The Safe Harbor Policy Claim. .............................................................. 11

    2.  The Incidental Take Statement Claim. ..................................................... 12

    3.  Pre-Representation Work. ...................................................................... 12

    4.  Pre-Complaint Work. ............................................................................ 13

    5.  Allegedly Excessive and Duplicative Work. ............................................. 13

    6.  Allegedly Clerical and Administrative Work. ........................................... 14

F.  Fees Since Filing the Motion. ...................................................................... 15

G.  Plaintiffs Are Entitled to Their Attorney's Travel Expenses. ......................... 15

Conclusion. ........................................................................................................ 15

Table of Authorities

Cases:

*Al-Harbi v. I.N.S.*,
    284 F.3d 1080 (9th Cir. 2002) ........................................................................ 2

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................................... 1

*Blum v. Stenson*,
    465 U.S. 886 (1984) ................................................................................... 8, 9

*Bundorf v. Jewell*,
    336 F. Supp. 3d 1248 (D. Nev. 2018) ......................................................... 11

*Californians for Alt. to Toxics v. Troyer*,
    No. CIV. S-05-1633 FCD KJM, 2006 WL 2346324 (E.D. Cal. Aug. 11, 2006) ............. 8

*Camacho v. Bridgeport Fin. Inc.*,
    523 F.3d 973 (9th Cir. 2008) ................................................................... 9, 10

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    No. C 06-4884 SI, 2011 WL 6092453 (N.D. Cal. Dec. 7, 2011) ................... 6

*Comm'r, I.N.S. v. Jean*,
    496 U.S. 154 (1990) ..................................................................................... 11

*Env't Def. Ctr. v. Bureau of Ocean Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) .......................................................................... 1

*Gates v. Deukmejian*,
    987 F.2d, 1392 (9th Cir. 1992) ................................................................... 10

*Greenpeace, Inc. v. Stewart*,
    No. 17-35945, 2020 WL 2465321 (9th Cir. May 12, 2020) ..................... 6, 15

*Gutierrez v. Barnhart*,
    274 F.3d 1255 (9th Cir. 2001) ....................................................................... 2

*Hapner v. Tidwell*,
    No. 09-35896, Doc. No. 60 (9th Cir. May 22, 2012) ..................................... 6

*Hensley v. Eckerhardt*,
    461 U.S. 424 (1983) ................................................................................ 11, 12

*Ibrahim v. U.S. Dep't of Homeland Security*,
    912 F.3d 1147 (9th Cir. 2019) ................................................................ 11, 12

*Int'l Woodworkers of Am., AFL-CIO Loc. 3-98 v. Donovan*,
    792 F.2d 762 (9th Cir. 1986) ........................................................ 15

*Klamath-Siskiyou Wildlands Ctr. v. NOAA*,
    99 F. Supp. 3d 1033 (N.D. Cal. 2015) ........................................... 3

*LOWD v. U.S. Forest Serv.*,
    No. 3:10-CV-013987-SI, 2014 WL 3546858 (D. Or. July 15, 2014) .............. 4

*Mendenhall v. Nat'l Trans. Safety Bd.*,
    213 F.3d 464 (9th Cir. 2000) ........................................................ 8

*Milgard Tempering, Inc. v. Selas Corp. of Am.*,
    761 F.2d 553 (9th Cir. 1985) ........................................................ 10

*Miller v. Vicorp Restaurants, Inc.*,
    No. C-03-00777 RMW, 2006 WL 212021 (N.D. Cal. Jan. 11, 2006) ............ 15

*Moreno v. Sacramento*,
    534 F.3d 1106 (9th Cir. 2008) .................................................. 14, 15

*Nadaradjah v. Holder*,
    569 F.3d 906 (9th Cir. 2009) ........................................................ 9

*Nat'l Family Farm Coal. v. U.S. EPA*,
    29 F.4th 509 (9th Cir. 2022) ........................................................ 9

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ...................................................... 4, 5

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008) ...................................................... 12

*Or. Nat. Res. Council v. Madigan*,
    980 F.2d 1330 (9th Cir. 1992) ...................................................... 4

*Pollinator Stewardship Council v. U.S. EPA*,
    No. 13-72346, 2017 WL 3096105 (9th Cir. June 27, 2017) .................... 14

*Puyallup Tribe of Indians v. Electron Hydro LLC*,
    No. 24-954, 2024 WL 3842099 (9th Cir. Aug. 16, 2024) .................... 2

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ...................................................................... 3

*USA Petroleum Co. v. Atl. Richfield Co.*,
    13 F.3d 1276 (9th Cir. 1994) ........................................................ 1

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ........................................................... 1

*WildEarth Guardians v. U.S. Forest Service*,
    No. 1:19-CV-00203-CWD, 2023 WL 2586139 (D. Idaho March 21, 2023) ................. 11

Statutes:

28 U.S.C. § 1331 ........................................................................... 1

28 U.S.C. § 2412 ....................................................................... 1, 15


Federal Register:

*Threatened Status for SONCC ESU of Coho Salmon*,
    62 Fed. Reg. 24,588 (May 6, 1997) ................................................... 2

*Transfer of Certain Permits*,
    67 Fed. Reg. 57,970 (Sept. 13, 2002) ............................................. 14

1    Pursuant to Civil Local Rule 7-3(c), the Equal Access to Justice Act ("EAJA"), 28 U.S.C.

2    § 2412(d), and the Court's Order of September 3, 2025 (ECF No. 85), Plaintiffs hereby

3    respectfully file this reply to Defendants National Marine Fisheries Service et al. ("NMFS's")

4    response to their motion for attorneys' fees, costs, and other expenses. ECF No. 88.

5    Plaintiffs reply to only those issues NMFS raises in it response, in the order presented.

6    A.    Plaintiffs' Motion is Properly Brought under EAJA.

7    NMFS asserts "Plaintiffs' Motion fails at the outset because they asserted ESA citizen-

8    suit claims but failed to move for fees under the ESA citizen-suit provision." Ds' Opp. 3. The

9    Court had jurisdiction to consider Plaintiffs' successful challenges to the Biological Opinion

10    ("BiOp"), and the Environmental Assessment ("EA") pursuant to federal question jurisdiction,

11    28 U.S.C. § 1331, not the ESA citizens suit provision. *Bennett v. Spear*, 520 U.S. 154, 174

12    (1997) (BiOp); *Env't Def. Ctr. v. Bureau of Ocean Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022)

13    (EA). NMFS asserts that on summary judgment, Plaintiffs "pressed" an ESA citizen suit claim

14    by asserting NMFS's actions cause jeopardy, but that is wrong; it cites one sentence in Plaintiffs'

15    opening brief that simply states Congress enacted ESA Section 7 to prevent jeopardy. Ds' Opp. 4

16    (citing ECF No. 37 at 33). On the cross-motions for summary judgment, Plaintiffs did not assert

17    NMFS's actions substantively cause jeopardy, NMFS did not defend such a claim, and the Court

18    did not adjudicate it.[1] Plaintiffs did not "prevail" on such a claim, so it cannot be a basis for a

19    motion for attorneys' fees.[2] Rather, Plaintiffs' motion is properly brought under EAJA.

20    B.    Plaintiffs' Motion is Timely.

21    NMFS asserts Plaintiffs' motion is untimely under EAJA because it was not filed within

22    30 days of February 12, 2025, when the Ninth Circuit issued a memorandum dismissing their

23    appeal. Ds' Opp. 7. To be timely, Plaintiffs' EAJA motion must be filed within 120 days, not 30

---

[1]  A pleaded claim can be abandoned at summary judgment if not pursued, and is treated as waived. *USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994).

[2]  Nor is Plaintiffs' challenge to the sufficiency of the BiOp "coextensive" with an affirmative substantive jeopardy claim. *Cf.* Ds' Opp. 4. These are different claims, with different jurisdictional bases. *See, e.g.*, *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 525 & 532 (9th Cir. 2010) (considering separate claims of the sufficiency of a BiOp, and substantive jeopardy).

days, after the Ninth Circuit entered judgment on February 12, 2025. *Al-Harbi v. I.N.S.,* 284 F.3d

1080, 1083–84 (9th Cir. 2002). Plaintiffs filed on May, 2, 2025, within 120 days. ECF No. 74.

C.    <u>NMFS's Position Was Not Substantially Justified.</u>

NMFS bears the burden of proving its position was substantially justified in the

underlying action, and in the litigation defending its validity. *Gutierrez v. Barnhart,* 274 F.3d

1255, 1258 (9th Cir. 2001). NMFS fails to prove its position was substantially justified in either.

1.    <u>NMFS's Underlying Action Was Not Substantially Justified.</u>

In 1997, NMFS listed coho salmon in the SONCC ESU as threatened with extinction in

part due to dams and water withdrawals, and high water temperatures and low streamflows.

*Threatened Status for SONCC ESU of Coho Salmon*, 62 Fed. Reg. 24,588, 24,592 (May 6,

1997). In 2014, NMFS issued a Recovery Plan for the ESU, establishing the Shasta River coho

population as a demographically independent, "core" population in the ESU that "must be at low

risk of extinction to achieve recovery" for the ESU. AR 76, AR 15331. The Recovery Plan states

that in the Shasta, "agricultural practices" and "dams/diversions" pose "very high" and "key

limiting threats" to coho. AR 15433. To contribute to the viability of the ESU, "the Shasta River

core population should have at least 4,700 spawners." AR 16833. The "depensation threshold"

for coho in the Shasta—"the minimum number of adults needed for survival of [the]

population"—is 144 returning adults. AR 60; AR 2089. In 2014, shortly after NMFS initiated its

processes under the Safe Harbor Policy, Ds' Br. 8, the number of coho returning to the Shasta

was 46. AR 77. The coho population in the Shasta was at "high risk of extinction." AR 16832.

At that juncture, NMFS chose to begin evaluating whether to grant ESA "take" immunity

to the owner of Dwinnell Dam, and thirteen other entities that divert from the river, impound

springs, or both, under the Safe Harbor Policy and Enhancement of Survival Permits. NMFS

chose to do so because as it represented to the Court, the "impoundments and diversions on the

Shasta River occur primarily on state, municipal, or private lands, [and] NMFS has little to no

ability to influence their operations." ECF No. 41 at 5 (internal pagination). That representation

was incorrect as a matter of law. *Puyallup Tribe of Indians v. Electron Hydro LLC*, No. 24-954,

2024 WL 3842099, at *1-2 (9th Cir. Aug. 16, 2024) (affirming finding of take of ESA-listed

salmonids by dam on private lands); *Klamath-Siskiyou Wildlands Ctr. v. NOAA*, 99 F. Supp. 3d 1033, 1041–42 (N.D. Cal. 2015) (evaluating incidental take permit for logging on private lands).

But having chosen the Safe Harbor Policy pathway, NMFS stated the dam owner and diverters had only to "voluntarily" adopt certain mitigation measures to obtain permits. AR 4. As a result, again as NMFS represented to the Court, "the [Safe Harbor] Agreement and Permits needed to include terms and conditions to which private landowners would *actually agree*." ECF No. 41 at 45 (emphasis in original); ECF No. 47 at 23 ("Because the [Safe Harbor] Agreement was 'purely voluntary,' NMFS could not consider alternatives with flow scenarios to which the Permittee-landowners would not agree."). In turn, in fact, the dam owner and diverters would not agree to greater releases from the dam or reduced diversions, because they were "unacceptable due to the impacts they would have on agricultural needs." AR 827. So ultimately NMFS granted the permittees take immunity under the ESA if they sought to achieve at best only Tier 1 water flows, the least relative to two other tiers, which NMFS admitted "may not maintain fish at the population level." ECF No. 41 at 45 (citing AR 909). In sum, before Plaintiffs filed suit, NMFS issued 20-year take permits to 14 permittees whose "agricultural practices" and "dams/diversions" cause "very high" and "key limiting threats" to coho in the Shasta, even though it knew those flows may not even *maintain* a population at "high risk of extinction." AR 15433, AR 16832, AR 909. NMFS's underlying action was not substantially justified under the ESA, which the Supreme Court stated was codified "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

2.     <u>NMFS's Litigation Position Was Not Substantially Justified</u>.

Separately, NMFS's litigation position was also not substantially justified. First, NMFS represented to the Court that "the third party operation of Dwinnell Dam is not part of the agency action on which NMFS consulted in 2021" [*sic*], and "authorization for any take associated with operation of the dam was previously provided." ECF No. 41 at 28. The former representation is incorrect: After NMFS prepared the BiOp, it issued a take permit to Montague, which owns and operates Dwinnell Dam, AR 1445–47, and the permit "authorizes the Permittee to incidentally take SONCC coho salmon consistent with the terms and conditions of the [Template Safe

Harbor] Agreement, Site Plan Agreement, ITS, and this permit." AR 1446. Further, NMFS never cited anything to support its latter representation. *Cf.* ECF No. 41 at 28. In fact, the prior settlement of the *Karuk Tribe* case resulted in an agreement to seek funding to line the canal amd screen a diversion, and to release some more water, AR 2553, but there was never consultation nor take coverage for the fish blockage, impoundment, or operations of Dwinnell Dam. AR 477. That is why the BiOp states the "proposed action" is to enter new site plan agreements, "pursuant to which NMFS will issue" take permits, including to the dam owner. AR 9. Indeed, the Court recognized these representations were not true, stating in its summary judgment order that "[t]he administrative record speaks otherwise." ECF No. 47 at 18.

Nor was NMFS's litigation position substantially justified as to the applicable law. In the BiOp, NMFS chose to demarcate the "action area" as "the metes and bounds of the permittees' respective properties," which the Court noted contradicts the explicit text of the regulation defining "action area" to mean "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." ECF No. 47 at 17 (citing 50 C.F.R. § 402.02). NMFS's choice to do so masked direct and indirect effects of the dam and diversions, including greatly reduced downstream flows, lack of sediment transport throughout the basin, blocked juvenile coho movement through the basin, and hot or dirty flood irrigation return flows downstream.[3] AR 2674, AR 65, AR 1454. In its response here, NMFS asserts no new basis to justify its position on these points, and re-asserts its defenses "in the merit briefs." Ds' Opp. 10 & 11. However, "arguments rejected by the Court in its original determination . . . do not suffice to show that the government's position was substantially justified." *LOWD v. U.S. Forest Serv.*, No. 3:10-CV-013987-SI, 2014 WL 3546858, at *3 (D. Or. July 15, 2014) (citing *Or. Nat. Res. Council v. Madigan*, 980 F.2d 1330, 1332 (9th Cir. 1992) (same)). As to the action area, there was no reasonable basis for NMFS to avoid the facts in the record, contradict the text of the regulation, and contradict adverse appellate precedent. *See Native Ecosystems Council v.*

---

[3] NMFS's circumscribed action area also excluded the effects of Dwinnell Dam blocking coho from accessing 61.4 miles of "high quality fish habitat" upstream. AR 372.

*Dombeck*, 304 F.3d 886, 900–02 (9th Cir. 2002) (agency unlawfully defined action area to exclude lands where actions indirectly affect ESA-listed grizzly bears).

As to the Court's ruling that the BiOp relies on mitigation measures not reasonably certain to occur, ECF No. 47 at 19-21, NMFS primarily asserts its position was substantially justified because the "measures would be monitored through annual reporting and an adaptive management program and a five-year check-in with a quantified performance assessment that could trigger reinitiation of consultation." Ds' Opp. 10. But that does not respond to the Court's correct ruling that the measures, such as screening the Parks Creek diversion, are not reasonably certain to occur. (In fact, the diversion is still unscreened, and the permittee wants the measure "waived." Second Declaration of Peter M. K. Frost, ¶ 1, Ex. A at 3). Moreover, counsel for NMFS emailed counsel for Plaintiffs stating NMFS will *not* perform the five-year check-in, required this year to "assess the cumulative effectiveness of the [Safe Harbor Agreement] relative to making a contribution towards recovery" of coho. AR 105; Second Decl. Frost, ¶ 2, Ex. B. Instead, NMFS "anticipates revisiting that five-year check-in" in the new BiOp. *Id*.

Turning to the NEPA claims, NMFS notes Plaintiffs asserted four arguments, and concedes the Court addressed two, both in Plaintiffs' favor. Ds' Opp. 11. As to flows, the Court examined the Flow Management Strategy, and noted NMFS never quantified the actual amount of water the permittees divert. ECF No. 47 at 23-24. In its response here, NMFS does not dispute that fact, nor explain why, over a seven-year planning process, it did not demand the permittees disclose how much water each diverts. The Court also noted that "adopting Tier 1 levels of water flow is not recommended by [NMFS's] own policies and guidance," and that "[w]ithout providing the amount of water currently diverted and then using the lowest level of waterflow to maintain individual fish, may lead to the eradication of the population." *Id*. at 23 & 26. Here, NMFS has no responses as to why it did not follow its own policies and guidance, nor does it have any further justification (let alone substantial) why it chose Tier 1, knowing it may not even maintain the Shasta coho population. *Cf.* Ds' Br. 11-12. And it was not just Plaintiffs, but the Court also noted the dire context of NMFS's decisions: the Shasta coho population is "well below the depensation level." ECF No. 47 at 25.

Finally, and separately, as to what the Court ruled is the unlawful cumulative effects analysis in the EA, NMFS makes no specific argument in its response why its litigation position may have been substantially justified. *Cf.* Ds' Opp. 11-13.

NMFS's underlying action, and its litigation position, were not substantially justified.

D.    Plaintiffs Seek Reasonable Rates.

1.    Mr. Ince-Johannsen Possesses Distinctive Skills in Environmental Litigation.

Relying exclusively on out-of-circuit cases, NMFS asserts Mr. Ince-Johannsen does not possess distinctive skills in environmental litigation, first because his law school experiences are irrelevant. Ds' Opp. 14. The Ninth Circuit Appellate Commissioner disagrees. *Greenpeace, Inc. v. Stewart*, No. 17-35945, 2020 WL 2465321, at *6 (9th Cir. May 12, 2020) (recognizing an attorney's pre-law school and law school experiences as bases for establishing expertise in environmental law). NMFS then asserts that because Mr. Ince-Johannsen had two years of practice when this case was filed, he should not receive market rates for any of years this case was prosecuted. Ds' Opp. 15. Years of practice matters, but it is not dispositive; what controls is the attorney's record. *Hapner v. Tidwell*, No. 09-35896, Doc. No. 60 at 5 & 8 (9th Cir. May 22, 2012) (awarding market rates under EAJA to an attorney for work her first year practicing environmental law); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. C 06-4884 SI, 2011 WL 6092453, at *4 (N.D. Cal. Dec. 7, 2011) (same, based on attorney's record). As proven in Plaintiffs' motion, Mr. Ince-Johannsen has a strong record of distinctive skills in environmental law, from graduating law school *cum laude* with a certificate in environmental law; receiving two distinct law school environmental awards; editing for both *Environmental Law* and its subsidiary *Ninth Circuit Review*; competing in National Environmental Moot Court; working each of two summers for a non-profit environmental law firm, and for a conservation group; and then, since 2019, practicing exclusively federal environmental law, including serving as counsel in numerous federal environmental cases. Declaration of Sangye Ince-Johannsen, ¶¶ 2–11. Mr. Ince-Johannsen possesses distinctive skills in environmental law.

2.    Plaintiffs' Attorneys' Distinctive Skills Were Needed in this Case.

NMFS asserts Plaintiffs' attorneys' skills were not needed in this case, because anyone "with access to a law library and the other accoutrements of modern legal practice" could have prosecuted it. Ds' Opp. 16 (citation omitted). This case involved the Safe Harbor Policy, the CHERP BiOp, a 97-page Flow Management Strategy and Diversion Reduction Schedule, AR 464-561, a 98-page Net Conservation Benefit finding, AR 365-463, a 18-page Template Safe Harbor Agreement, AR 205-23, and fourteen separate Site Agreements for a dam owner, two public irrigation districts, and ten diverters, AR 121-92 (Appendix 1), all of which NMFS then portrayed in the BiOp and EA. Mr. Frost declares that in his experience, this was a complex environmental case that was hard to distill. Second Decl. Frost, ¶ 5. That the Court was able to resolve the cross-motions for summary judgment in 11 pages is (hopefully) testament to the clarity of how all counsel presented the issues, not that it was easy. *Cf.* Ds' Opp. 15-17. Finally, Plaintiffs' attorneys' declarations are supported by outside counsel who attest their distinctive knowledge and skills were needed for Plaintiffs to prevail. Declaration of Michael R. Lozeau, ¶ 10. NMFS fails to meet its burden of offering any contrary proof.

       3.   <u>Plaintiffs Prove Qualified Counsel Were Unavailable at the EAJA Base Rate</u>.

Plaintiffs' representatives declare under penalty of perjury they could not find qualified attorneys to undertake this case at the EAJA base rate. Declaration of Thomas E. Wheeler, ¶ 2; Declaration of Nick Joslin ¶ 2. In addition, Mr. Wheeler declares, more generally: "EPIC is currently involved in approximately five lawsuits against federal agencies in federal courts. Based on my experience seeking qualified attorneys to agree to undertake these cases, it is nearly impossible to find qualified attorneys in California willing to litigate against federal agencies in federal court under EAJA base rates. Indeed, in my experience, for even relatively simple civil lawsuits (which this case was not) in the forum, qualified attorneys routinely charge far higher than EAJA base rates." Wheeler Decl., ¶ 2; Joslin Decl., ¶ 2. NMFS asserts their testimony is "boilerplate" and insufficient. Ds' Opp. 17. But "where plaintiffs submit declarations from plaintiffs and attorneys demonstrating that their attorneys' distinctive skills were unavailable elsewhere at the statutory rate, and the government fails to provide evidence to the contrary,

1     plaintiffs satisfy the last element of the *Love* [*v. Reilly*] test." *Californians for Alt. to Toxics v.*

2     *Troyer*, No. CIV. S-05-1633 FCD KJM, 2006 WL 2346324, at *18 (E.D. Cal. Aug. 11, 2006).

3         NMFS asserts Plaintiffs did not "seek[] out representation" but, rather, their attorneys

4     timesheets' indicate their attorneys soliticed them. Ds' Opp. 18. This assertion is both immaterial

5     and incorrect. Plaintiffs were involved in NMFS's planning processes as early as 2019, when, for

6     example, David Webb, board member of Plaintiff Friends of the Shasta, commented at length on

7     the draft EA. AR 870, AR 1006-1015. This was long before March 21, 2021, when Plaintiff

8     Environmental Protection Information Center reached out to Mr. Frost to discuss prospective

9     representation. Declaration of Peter M. K. Frost, ¶ 20, Ex. A (first time entry).

10        NMFS notes its attorneys sought from Plaintiffs' attorneys their attorney-client privileged

11    retainer agreements. Ds' Opp. 18. NMFS's attorneys did so because they asserted that what

12    Plaintiffs' attorneys may have charged their clients is "highly relevant to determining what a

13    reasonable rate is." Second Decl. Frost, ¶ 3 (quoting email). But a reasonable rate under EAJA

14    is "is not made by reference to the rates actually charged the prevailing party." *Mendenhall v.*

15    *Nat'l Trans. Safety Bd*., 213 F.3d 464, 471 (9th Cir. 2000). Instead, "it is well-settled that an

16    award of attorneys fees [under EAJA] is not necessarily contingent upon an obligation to pay

17    counsel. . . . The presence of an attorney-client relationship suffices to entitle prevailing litigants

18    to receive fee awards." *Nadaradjah v. Holder*, 569 F.3d 906, 916 (9th Cir. 2009). Plaintiffs and

19    their attorneys have an attorney-client relationship, which suffices. Second Decl. Frost, ¶ 7.

20        Finally, NMFS asserts it is "highly relevant" as to whether qualified counsel were

21    available at the EAJA base rate in the forum that two of Plaintiffs' three attorneys work for a

22    non-profit public interest law firm. Ds' Opp. 18. In *Blum v. Stenson*, 465 U.S. 886 (1984), the

23    Supreme Court held that "in determining the amount of fees to be awarded [under 42 U.S.C. §

24    1988, and similar statutes], it is not legally relevant that plaintiffs' counsel . . . are employed by .

25    . . a privately funded non-profit public interest law firm." *Id*. at 895 (citation omitted). Affirming

26    market rates for attorneys from The Legal Aid Society of New York, the Supreme Court stated

27    "[i]t is in the interest of the public that such law firms be awarded reasonable attorneys' fees to

28    be computed in the traditional manner when its counsel perform legal services otherwise

1   entitling them to the award of attorneys' fees." *Id*. The same is true here with attorneys from the

2   Western Environmental Law Center, who not only represent Indian tribes and non-profit

3   conservation groups in federal environmental cases, but also perform public interest work such

4   as presenting at Continuing Legal Education panels, and teaching students enrolled in the

5   Environmental Law Clinic at the University of Oregon School of Law. Second Decl. Frost, ¶ 8.

6          NMFS fails to provide evidence that Plaintiffs fail to prove qualified counsel were

7   available at the EAJA base rate. Accordingly, Plaintiffs meet all three factors in *Love v. Reilly*.

8          4.    There Is No Precedent For Departing from the Forum Rule.

9          The relevant community for determining market rates is the forum in which the district

10  court sits. *Camacho v. Bridgeport Fin. Inc.*, 523 F.3d 973, 979–80 (9th Cir. 2008) (forum rule

11  applies in district court). NMFS asserts this Court should depart from Ninth Circuit precedent

12  and adopt a new rule in this case, and compensate Plaintiffs' out-of-district attorneys at rates

13  where they did "the bulk of their work." Ds' Opp. 18-20 (citing *Nat'l Family Farm Coal. v. U.S.*

14  *EPA*, 29 F.4th 509 (9th Cir. 2022)). *Family Farm* concerns a petition for direct appellate review

15  filed by a national coalition challenging EPA's registration of pesticides for use nationally,

16  which the Ninth Circuit noted was randomly assigned for argument (held virtually) to a panel

17  sitting in San Francisco (a prior iteration was assigned to a panel in Seattle). 29 F.4th at 512–13.

18  As a matter of first impression, and on those unique facts, the Ninth Circuit departed from the

19  forum rule and awarded rates based on where those attorneys did the bulk of their work. *Id*. But

20  the Ninth Circuit noted there was no district court proceeding in that case. *Id*. at 512. And that

21  petition–concerning national pesticide registrations for use anywhere in the country–could have

22  been filed in any circuit where the petitioners could establish injury. By contrast, this case

23  concerns an ESA-listed coho salmon ESU that exists only in Northern California and Southern

24  Oregon; NMFS's actions apply only to the Shasta River in Northern California; Plaintiff EPIC

25  resides in this district; the NMFS officials who signed the BiOp and EA (Alecia Van Atta and

26  Jim Simondet) reside in this district; two of EPIC's standing declarants (Tenaya Norris and

27  Samuel Genshaw) reside in this district (ECF Nos. 37-1 & 37-2); the administrative record exists

28  in this district (ECF No. 28); venue is proper in this district, as NMFS conceded in the case

management statement (ECF No. 28, #1); and the summary judgment hearing was live and held in San Francisco. ECF No. 46. This is not an anomolous case but rather a forum-anchored district court action, so market rates in the forum apply.[4]

In sum, Plaintiffs surpass their evidentiary burden of proving, with Ninth Circuit and Northern District fee orders, and the declaration of Michael R. Lozeau, the prevailing market rates for attorneys with similar skills and experience in the forum of San Francisco. *Camacho*, 523 F.3d at 980 (stating evidentiary standard). In its response, NMFS fails to meet its burden of providing contrary evidence. *Gates v. Deukmejian*, 987 F.2d, 1392, 1397–98 (9th Cir. 1992) ("The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits."). The Court should award Plaintiffs their rates for Mr. Frost and Mr. Ince-Johannsen.

5.    Mr. Wheeler is Entitled to Fees.

NMFS asserts Mr. Wheeler is not entitled to any fees because he is Executive Director of EPIC and, therefore, solely a "client." Ds' Opp. 20. Mr. Wheeler directs EPIC, but he also works for EPIC as an attorney who litigates cases. Second Declaration of Thomas E. Wheeler, ¶¶ 2–3. Here, he performed work as an attorney in his capacity as "co-counsel" under Civil Local Rule 11-3(a)(3) for admission *pro hac vice* for Mr. Frost and Mr. Ince-Johannsen. *Id.* ¶ 3; *see* ECF No. 12. Mr. Wheeler's declaration and timeslips prove he performed substantive legal work to help Plaintiffs prevail: he read and suggested edits to Plaintiffs' draft complaint; draft motion for summary judgment; draft summary judgment opposition/reply; and draft Rule 59(e) motion. Declaration of Thomas E. Wheeler, ¶¶ 3 & 4, Ex. A. This is not "Executive Director" work, it is substantive legal work for which Mr. Wheeler is entitled to the modest fees sought. *Cf. Milgard Tempering, Inc. v. Selas Corp. of Am.*, 761 F.2d 553, 558 (9th Cir. 1985) (only when "in-house counsel are not actively participating (e.g., acting only as liaison), fees should not be awarded.").

E.    Plaintiffs Seek Reasonable Time.

---

[4]  If the Court considers other than the forum rule, NMFS is incorrect about market rates in Eugene for Mr. Frost. Second Decl. Frost, ¶¶ 9 & 10.

1    NMFS asserts "three main categories of non-compensable work" performed by Plaintiffs'

2    attorneys: "1) pre-retainer and pre-complaint work, 2) duplicative and excessive work, and 3)

3    clerical and administrative work." Ds' Opp. 21. Plaintiffs address each below, separating out pre-

4    retainer and pre-complaint work. Before doing so, however, Plaintiffs address the Safe Harbor

5    claim, which they lost, and the Incidental Take Statement claim, which the Court did not reach.

6        1.    The Safe Harbor Policy Claim.

7    In the body of its response, NMFS does not address whether Plaintiffs can recover for

8    their Safe Harbor Policy claim, which they lost, but NMFS drops two footnotes to that effect.

9    Ds' Opp. 5 n. 9 & 16 n.18. However, an argument relegated to a footnote is not "properly raised

10   before the court." *WildEarth Guardians v. U.S. Forest Service*, No. 1:19-CV-00203-CWD, 2023

11   WL 2586139, at *15 n.19 (D. Idaho March 21, 2023) (citation omitted). Regardless, by

12   footnotes, NMFS fails to address the correct standards for compensability for lost claims. The

13   Supreme Court has held that "[l]itigants in good faith may raise alternative legal grounds for a

14   desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient

15   reason for reducing a fee. The result is what matters." *Hensley v. Eckerhardt*, 461 U.S. 424, 435

16   (1983). It has also held that "the EAJA—like other fee-shifting statutes—favors treating a case

17   as an inclusive whole, rather than as atomized line-items." *Comm'r, I.N.S. v. Jean*, 496 U.S. 154,

18   161–62 (1990). Accordingly, time spent on unsuccessful claims are compensable if they "involve

19   a common core of facts *or* are based on related legal theories" with successful claims. *Ibrahim v.

20   U.S. Dep't of Homeland Security*, 912 F.3d 1147, 1174 (9th Cir. 2019) (en banc) (emphasis in

21   original). They are not compensable if "entirely distinct and separate" from successful claims. *Id*.

22   The "focus is to be on whether the unsuccessful and successful claims arose out of the same

23   'course of conduct.' If they didn't, they are unrelated under *Hensley*." *Id*. (citation omitted).

24   Here, NMFS's choice to adopt the Safe Harbor Policy underpinned all of its actions: what

25   kind of permit NMFS would issue under ESA Section 10 (enhancement of survival, instead of

26   incidental take); the structure and assumptions in the BiOp, predicated on achieving only an

27   ostensible "net conservation benefit" standard that exists only in the Safe Harbor Policy; and

28   whether its actions may have a significant environmental effect under NEPA. Indeed, the Court

1  rejected Plaintiffs' claim that the conditions of the Safe Harbor Policy could be enforced because
2  it is an "interpretative rule" that serves "as internal guidance to the agency on provisions to
3  incorporate in each Safe Harbor Agreement," which NMFS entered into with 14 permittees. ECF
4  No. 47 at 16. The Court should not exclude the 60.9 hours Plaintiffs' attorneys spent on their
5  Safe Harbor Policy claim, which would result in a $41,713.76 reduction in Plaintiffs' fee request.
6  Declaration of Young Kang, ¶ 18, Ex. D, at 6.

7       2.   <u>The Incidental Take Statement Claim</u>.

8       In one sentence in a footnote, NMFS asserts "Plaintiffs were not successful" on their ITS
9  claim, and cannot be compensated for that time. Ds' Opp. 5 n.9. In ruling the BiOp unlawful,
10  vacating it, and remanding to NMFS to prepare a new BiOp, the Court did not reach and resolve
11  Plaintiffs' ITS claim. ECF No. 47 at 16–21. But an unreached claim is not the same as a lost
12  claim. The Ninth Circuit has stated: "We are aware of no court that has held that a plaintiff who
13  obtains full relief on some claims, thereby rendering it unnecessary to reach the remaining
14  claims, 'lost' on the unreached claims." *Ibrahim*, 912 at 1173 (holding that district court erred in
15  treating unreached claims as unsuccessful claims); *Hensley*, 461 U.S. at 435 (a court's "failure to
16  reach certain grounds is not a sufficient reason for reducing a fee."). Accordingly, district courts
17  have awarded time spent on ESA claims that were not reached. *See, e.g., Bundorf v. Jewell*, 336
18  F. Supp. 3d 1248, 1256 (D. Nev. 2018). There is no basis for a reduction in this respect.

19       3.   <u>Pre-Representation Work</u>.

20       NMFS conjoins and objects to much of Plaintiffs' attorneys' pre-representation and pre-
21  complaint work. Ds' Opp. 22-23. They are not the same. Before agreeing to represent a client
22  and undertake a case on its behalf, an attorney must perform due diligence under Rule 11 about
23  issues such as the plausibility and reasonable success of any claims, and relief; the attorneys' and
24  their clients' conflicts; and, in the context of the Klamath River basin (including the Shasta),
25  should consider the Indian tribes who have resided there for millennia, and the ethical issues of
26  ensuring respect to tribal interests and cultures. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d
27  1058, 1081–84 (9th Cir. 2008) (Fletcher, J., dissenting). This is especially so here since the
28  Karuk Tribe had sued the owner of Dwinnell Dam for "take" and entered into a settlement

1    agreement, AR 2553, and two of Plaintiffs' standing declarants are Yurok. ECF No. 37-1

2    (Tenaya Norris), ECF No. 37-2 (Samuel Genshaw III). NMFS states it began developing Safe

3    Harbor agreements in 2013, Ds' Opp. 8, culminating in the BiOp and EA in 2020. By contrast,

4    Plaintiffs' lead attorneys were first sought out on March 21, 2021, after the BiOp and EA were

5    issued, to consider undertaking a case about things they had no prior role in or knowledge about.

6    Second Frost Decl. ¶ 4. Mr. Frost and Mr. Ince-Johannsen then spent 82.8 hours (worth $57,689)

7    before November 21, 2021, when their firm's Board of Directors approved this case, seeking to

8    ensure the work they proposed to undertake is consistent with their clients, tribes' and

9    declarants' interests. *Id*. ¶ 6. This time was reasonably spent, and is recoverable under EAJA, but

10   Plaintiffs agree to a 20% reduction of this time, or $11,537.79 from their fee request.

11          4.      Pre-Complaint Work.

12          Once Plaintiffs' attorneys were approved to represent them, they spent 258.40 hours

13   working up the facts and claims before filing suit on June 15, 2022. Second Decl. Frost, ¶ 5.

14   Much of this time was spent researching and preparing the extensive background section of the

15   prospective motion for summary judgment, and refining claims, so that time did two productive

16   things: (1) ensured both the allegations and claims in the complaint were well-supported and (2)

17   decreased the amount of time Plaintiffs' attorneys spent briefing summary judgment. *Id*. ¶ 12.

18          5.      Allegedly Excessive and Duplicative Work.

19          NMFS asserts Plaintiffs' attorneys billed for "excessive and duplicative" work because

20   they billed for "the same research tasks." Ds' Opp. 23. The sole example NMFS gives is Mr.

21   Frost and Mr. Ince-Johannsen billing "numerous [unspecified] hours to research the ESA's

22   legislative and regulatory history," and asserts "this was not a significant issue in any of the

23   parties'" briefing or claims. *Id*. To the contrary, this was the second federal district court case

24   ever to challenge take permits issued under ESA Section 10(a)(1)(A) based on the Safe Harbor

25   Policy. And, although Mr. Frost has experience with other "ESA claims," Ds' Opp. 23, he had

26   none with the unique factual and legal aspects of this case. Second Decl. Frost, ¶ 5. The Ninth

27   Circuit has held that it is only any "unnecessarily duplicative" work attorneys perform that is not

28   compensable. *Moreno v. Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (reversing district

1    court reduction of 227.9 hours of research to 171 hours). Plaintiffs' attorneys' research into the

2    statutory, regulatory, and agency policy underpinning of Enhancement of Surival Permits and the

3    Safe Harbor Policy was not unnecessarily duplicative.[5]

4          Moreover, "excessive" and "duplicative" are different things, which NMFS's declarant

5    improperly commingles. Ds' Opp. 23, Decl. Kang, Ex. I. Does NMFS assert that Mr. Wheeler's

6    36-minute telephone call with Mr. Frost on 1/11/22 re "Call Frost about tribal council and fish

7    staff, Big Springs dam and projects, case strategy" was "excessive," meaning the work should

8    not have been billed, or "duplicative," because two counsel discussed the issue? Either way,

9    counsel discussing tribal council's views, a permittee's dam and related projects, and case

10   strategy, is compensable. Indeed, it appears that when a time entry includes a phone call (denoted

11   as "TC"), NMFS labels it as "duplicative." Decl. Kang, Ex. I. To properly oppose Plaintiffs'

12   motion, NMFS must specify the grounds for its objections. *Pollinator Stewardship Council v.*

13   *U.S. EPA*, No. 13-72346, 2017 WL 3096105, at *13 (9th Cir. June 27, 2017) (requiring a "more

14   specific explanation" for commingled objections). NMFS fails to do so under this broad,

15   commingled category of entries. The Court should not make a reduction in this context.

16         6.   Allegedly Clerical and Administrative Work.

17         NMFS's characterization of clerical and administrative work makes little sense. Ds' Opp.

18   23 (citing Decl. Kang, Ex. I). For example, NMFS relegates to this category Mr. Frost's 1.3

19   hours on 9/16/22 when he: "Read [Local Rules], ADR rules, ADR handbook, email client

20   synopsis, set/calendar call to discuss." That work was required under Civil Local Rule 16-8.

21   Second, on 2/10/23, NMFS allows the 24-minutes when Mr. Frost "prepare[d] for Sangye

22   strategy/complete work meeting," but excludes the next 30 minutes re: "meeting Sangye re same,

23   tasks, substance of claims, calendar," perhaps because he put tasks into his calendar. Third,

24

25        [5]  For example, their research revealed NMFS itself "recognizes that current section 10(a)(1)(A)

26   of the ESA permit regulations do not address information requirements or issuance criteria for
     enhancement of survival permits with Safe Harbor Agreements," *Transfer of Certain Permits*, 67

27   Fed. Reg. 57,970, 57,972 (Sept. 13, 2002), and that NMFS would "seriously consider"
     conducting new rulemaking before entering Safe Harbor agreements. *Id.* Plaintiffs did not prevail

28   on this claim, but that does not mean their research to present it is not compensable.

1  contrary to NMFS's characterizations, no litigator should *not* read ECF case notices, even if they

2  may state scheduling or lesser matters (opposed Frost entries on 7/28/2022, 11/7/2022,

3  1/6/2023). Even accepting NMFS's mischaracterizations of many entries in this category, it

4  concedes Plaintiffs' attorneys omit and do not seek compensation for almost one-half (25.60 of

5  55.60 hours) of them. If the Court is inclined to reduce Plaintiffs' award due to administrative or

6  clerical work, it should "impose a small reduction, no greater than 10 percent—a 'haircut'—

7  based on its exercise of discretion and without a more specific explanation." *Moreno*, 534 F.3d at

8  1112. That means 10% of 30 hours or, by NMFS's calculations, $2,392. Yang Decl. Ex. J at 10.

9  F.    <u>Fees Since Filing the Motion</u>.

10      Plaintiffs seek 24.90 hours for Mr. Frost's time after they filed their fees motion on May

11  2, 2025. Second Decl. Frost, ¶ 11, Ex. D. Beginning with his entry on February 20, 2025, he has

12  spent a total of 41.80 hours on the fees proceeding, Second Decl. Frost, ¶ 11, which is less than

13  approved in other cases. *Greenpeace, Inc.,* 2020 WL 2465321, at *10 (approving 119.6 hours for

14  fee proceeding); *Miller v. Vicorp Restaurants, Inc.*, No. C-03-00777 RMW, 2006 WL 212021, at

15  *4 (N.D. Cal. Jan. 11, 2006) (same, approving 90.8 hours). Of note, Plaintiffs do not claim time

16  for Mr. Wheeler, and only 1.8 hours for Mr. Ince-Johannsen, in this respect.

17  G.    <u>Plaintiffs Are Entitled to Their Attorney's Travel Expenses</u>.

18      NMFS asserts that if EAJA applies, the Court should not award Plaintiffs $974.49 in

19  travel expenses for its attorney to argue at the summary judgment, because "absent 'explicit

20  statutory authority,' cost awards are limited to those enumerated in 28 U.S.C. § 1920 and §

21  1821." Ds' Opp. 24. EAJA authorizes award of "costs," and, separately, "other expenses," 28

22  U.S.C. § 2412(d)(1)(A), which includes "attorney travel expenses." *Int'l Woodworkers of Am.,*

23  *AFL-CIO Loc. 3-98 v. Donovan*, 792 F.2d 762, 767 (9th Cir. 1986). The Court should award

24  Plaintiffs $1,721.28 in costs and expenses, including travel expenses. Frost Decl. ¶ 23, Ex. E.

25                              Conclusion.

26      The Court should award Plaintiffs $680,624.11. Second Decl. Frost, Ex. E (table).[6]

27

28  ---
   [6] Motion with expenses = $655,947.88 + $38,606.02 (reply) = $694,553.90, minus $11,537.79
   (20% of re-representation) and minus $2,392 (10% of administrative/clerical) = $680,624.11.
   Plaintiffs' Reply to Defendants' Response re: Motion for Attorneys' Fees, No. 3:22-cv-03520-TLT    15

Date: September 24, 2025.                Respectfully submitted,

/s/ Peter M. K. Frost
Peter M. K. Frost, *pro hac vice*
Sangye-Ince Johannsen, *pro hac vice*
Thomas E. Wheeler, CA Bar #304191

Attorneys for Plaintiffs